IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  $5,264.00 USC SEIZED FROM 2723 W. 11TH ST. GREELEY, CO;
2.  $7,930.63 USC SEIZED FROM 2864 COLORADO BLVD., DENVER, CO;
3.  $22,189.00 USC SEIZED FROM 3273 S. ACADEMY BLVD, COLORADO SPRINGS, CO;
4.  $4,658.00 USC SEIZED FROM 3958 N. ACADEMY BLVD., UNIT 112, COLORADO SPRINGS, CO;
5.  $9,760.00 USC SEIZED FROM 2402 E. BOULDER ST., COLORADO SPRINGS, CO;
6.  $15,073.75 USC SEIZED FROM 1722 S. PRAIRIE AVE., PUEBLO CO;
7.  $2,030.00 USC SEIZED FROM 1740 S. BUCKLEY ROAD, UNIT 9, AURORA, CO;
8.  $14,580.00 USC SEIZED FROM 1101/1101.5 S. PRAIRIE AVE., PUEBLO, CO;
9.  $5,874.78 USC SEIZED FROM 1593 TOP NOTCH TRAIL, PENROSE, CO; and
10. $4,440.00 USC SEIZED FROM 68 TUMBLEWEED DR, PENROSE, CO;
11. MISCELLANEOUS PRECIOUS METAL COINS AND BARS;
12. MISCELLANEOUS CRYPTOCURRENCIES SEIZED FROM NATHAN SUGAR;
13. $6,687.00 USC SEIZED FROM 26998 BIG SPRINGS RD. CALHAN, CO; and
14. $1,219.00 USC SEIZED FROM 5121 W. 11TH ST., UNIT 404 GREELEY, CO;

     Defendants.

---

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*
---

     The United States of America, by and through United States Attorney Peter McNeilly and Assistant United States Attorney Zachary Phillips, pursuant to Supplemental Rules for Admiralty, Maritime and Asset Forfeiture Claims G(2), states:

## JURISDICTION AND VENUE

     1.    The United States of America (the United States) has commenced this action pursuant to the civil forfeiture provisions of 18 U.S.C. §§ 981(a)(1)(A) and (C),

seeking forfeiture of defendant assets based upon violations of 18 U.S.C. § 1955 and 18 U.S.C. §§ 1956 and 1957.  This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

2.      Venue is proper under 28 U.S.C. § 1395, as the defendant property is located, and the acts described herein occurred in the District of Colorado.

## DEFENDANT PROPERTY

3.      Defendant property is more fully described as:

4.      Defendant $5,264.00 in United States currency was seized from 2723 W. 11th Street Greeley, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

5.      Defendant $7,930.63 in United States currency was seized from 2864 Colorado Boulevard Denver, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

6.      Defendant $22,189.00 in United States currency was seized from 3273 S. Academy Boulevard, Colorado Springs, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

7.      Defendant $4,658.00 in United States currency was seized from 3958 N. Academy Boulevard Unit 112, Colorado Springs, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

8.      Defendant $9,760.00 in United States currency was seized from 2402 E. Boulder Street, Colorado Springs, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

9.      Defendant $15,073.75 in United States currency was seized from 1722 S. Prairie Avenue Pueblo, Colorado on February 24, 2022. The defendant currency is

currently in the custody of the Internal Revenue Service.

10.    Defendant $2,030.00 USC was seized from 1740 S. Buckley Road, Unit 9, Aurora, Colorado, on February 24, 2022.  The defendant currency is currently in the custody of the Internal Revenue Service.

11.    Defendant $14,580.00 in United States currency was seized from 1101/1101.5 S. Prairie Avenue, Pueblo, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

12.    Defendant $5,874.78 in United States currency was seized from 1593 Top Notch Trail, Penrose, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

13.    Defendant $4,440.00 in United States currency was seized from 68 Tumbleweed Drive, Penrose, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

14.    Defendant Miscellaneous Precious Metal Coins and Bars was seized on February 24, 2022, from 1593 Top Notch Trail, Penrose, Colorado.  They are currently in the custody of the Internal Revenue Service.

15.    Defendant Miscellaneous Cryptocurrencies was seized on February 24, 2022, from a hardware wallet located at 1593 Top Notch Trail, Penrose Colorado.  The Defendant Cryptocurrencies are currently in a Treasury controlled wallet.  Defendant Miscellaneous Cryptocurrencies is more fully described as:

    a.  5.0089173 BITCOIN (BTC)
    b.  9.99999003 Bitcoin Cash (BCH),
    c.  1203.41727119 Dash (DASH),
    d.  550.6499262 Litecoin (LTC),
    e.  78.43064211 Zcash (ZEC),
    f.  8.987169 Ethereum (ETH)

g.  99.998656 Ethereum Classic (ETC), and

h.  103807 Cardano (ADA).

16.    Defendant $6,687.00 in United States currency was seized from 26998 Big Springs Road, Calhan, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

17.    Defendant $1,219.00 in United States currency was seized from 5121 W. 11th Street, Unit 404 Greeley, Colorado on February 24, 2022. The defendant currency is currently in the custody of the Internal Revenue Service.

## FACTUAL BASIS FOR FORFEITURE

18.    Except as otherwise noted, all of the following facts and information have been discovered through my own investigation and observations, and the observations and investigations of fellow law enforcement officers as reported to me.

### Background

19.    In 2020, the Pueblo Police Department began investigating criminal activity in and around the area of 1101 South Prairie Avenue, Pueblo, Colorado, a business called Crypto Arcades, that claimed to be an adult arcade.  The investigation revealed that it was an illegal gambling business, and that numerous other illegal gambling businesses were operating in Colorado.

20.    In March 2021, the Federal Bureau of Investigation (FBI) and the Internal Revenue Service (IRS) began an investigation into these establishments and became aware of twelve active gambling businesses operating in Pueblo, Colorado.  These illegal gambling businesses, herein referred to as "Fish Games," are establishments that offer gaming platforms with a cash prize.

21.    Often these establishments offer at least one game where groups of players

can shoot at virtual fish as they swim by on a video screen. There are numerous versions of games offered by businesses with differing rules, playstyle, and potential winnings, but all provide the entrant with the possibility of cash winnings.

22.    There are two basic models of the Fish Game establishments: those where customers gamble at physical gaming machines and those were customers use an app on their phone or other personal device and do not need to remain at the establishment to play.

23.    The Virtual Fish Games model allows patrons to use their phones to play games after purchasing credits from a physical location associated with the business. The Fish Games app allows customers to play numerous games, including games where customers shoot virtual fish, and traditional slot machines

Physical Fish Games

24.    In the establishments that maintain physical Fish Games machines, customers purchase credits from an on-site employee and use those credits to play Fish Games at the physical machines in the premises. Generally, customers can pay more credits to increase their chances of winning, for example by paying for more powerful ammunition or for a weapon which fires multiple shots at once to shoot at the virtual fish.

25.    One popular version of the Fish Games requires players to sit around a large table that allows multiple players to play on the same game at the same time. Each version of the Fish Games operates slightly differently, but the basic game mechanics are usually similar. Generally, during game play, the player sets the value of a shot; the higher the value of the shot (wager or bet) the higher the potential payout. The player then shoots at a variety of fish on the screen as they swim by. The fish have different

values and a successful shot payout is determined by the value of the shot or wager.

26.     When the customers are done playing, they cash out in various manners, depending on the establishment.  For example, some establishments have an ATM the players can use to cash out.  These ATMs are referred to as Crypto Transaction/Teller Machines, or CTMs.  Each establishment has varying rules on how much a player can take out of their winnings, from $300.00 a day to all winnings that were won that day, and that day only.

<u>**Gambling Businesses**</u>

27.     The federal gambling statute, 18 U.S.C. § 1955, defines "illegal gambling business" with respect to state law.  Generally speaking, "gambling" and "professional gambling" are illegal in Colorado.  § 18-10-103, C.R.S.

    a.  Gambling means "risking any money, credit, deposit, or other thing of value for gain contingent in whole or in part upon lot, chance, the operation of a gambling device, or the happening or outcome of an event, including a sporting event, over which the person taking a risk has no control, but does not include," among other things, "[b]ona fide contests of skill, speed, strength, or endurance in which awards are made only to entrants or the owners of entries."  § 18-10-102(2), C.R.S.

    b.  Professional gambling means "[a]iding or inducing another to engage in gambling, with the intent to derive a profit therefrom;" or "[p]articipating in gambling and having, other than by virtue of skill or

luck, a lesser chance of losing or a greater chance of winning than one or more of the other participants."

28.   Colorado law also prohibits various acts associated with gambling.[1]

    a.   Section 18-10-105 of the Colorado Revised Statutes prohibits owning, manufacturing, selling, transporting, possessing, or engaging in any transaction designed to affect the ownership, custody, or use of a "gambling device" or "gambling record."  A gambling device means, as pertinent here, "any device, machine, paraphernalia, or equipment that is used or usable in the playing phases of any professional gambling activity, whether that activity consists of gambling between persons or gambling by a person involving the playing of a machine."  § 18-10-102(3), C.R.S.  A gambling record means "any record, receipt, ticket, certificate, token, slip, or notation given, made, used, or intended to be used in connection with professional gambling."  § 18-10-102(7), C.R.S.

    b.   Section 18-10-106 of the Colorado Revised Statutes prohibits knowingly transmitting or receiving "gambling information" by telephone, telegraph, radio, semaphore, or other means or knowingly installing or maintaining equipment for the transmission or

---

[1]There are some acts or transactions that would fall within these prohibitions that are expressly authorized by Colorado law.  § 18-10-102(2)(c), C.R.S.  Limited gaming is permitted by law in certain cities in Colorado, *see* § 44-30-105, C.R.S., and on Native American Reservations.  *See* § 44-31-101, C.R.S.  None of the businesses discussed herein are at such locations.

receipt of "gambling information."  Gambling information means, as pertinent here, "a communication with respect to any wager made in the course of, and any information intended to be used for, professional gambling." § 18-10-102(4), C.R.S.

c.  Section 18-10-107 of the Colorado Revised Statutes prohibits any owner, lessee, agent, employee, operator, or occupant from knowingly maintaining, aiding, or permitting the maintaining of "gambling premises."  A gambling premises means, as pertinent here, "any building, room, enclosure, vehicle, vessel, or other place, whether open or enclosed, used or intended to be used for professional gambling." § 18-10-102(5), C.R.S.

d.  Section 18-10.5-103 of the Colorado Revised Statutes prohibits any person from offering, facilitating, contracting for, or otherwise making available to or for members of the public or members of an organization or club any "simulated gambling device" where "[t]he person receives, directly or indirectly, a payment or transfer of consideration in connection with an entrant's use of the simulated gambling device, admission to premises on which the simulated gambling device is located, or the purchase of any product or service associated with access to or use of the simulated gambling device, regardless of whether consideration in connection with such use, admission, or purchase is monetary or nonmonetary and regardless of whether it is paid or transferred before the simulated gambling

device is used by an entrant; and [a]s a consequence of, in connection with, or after the play of the simulated gambling device, an award of a prize is expressly or implicitly made to a person using the device."  A simulated gambling device means "a mechanically or electronically operated machine, network, system, program or device that is used by an entrant and that displays simulated gambling displays on a screen or other mechanism at a business location, including a private club, that is owned, leased, or otherwise possessed, in whole or in part, by a person conducting the game or by that person's partners, affiliates, subsidiaries, agents, or contractors."  § 18-10.5-102(6)(a).  However, this term does not include bona fide amusement devices authorized by state law that pay nothing of value, cannot be adjusted to pay anything of value, and are not used for gambling. *Id.*  For the purposes of this statute, gambling, whether used alone or as part of the phrases "simulated gambling device" has the meaning set forth above, except that the exception for bona fide contests of skill, speed, strength, or endurance does not apply.  § 18-10.5-102(3.5), C.R.S.

29.    The Colorado Department of Revenue Gaming Division also requires various licenses for permissible gaming establishments.

a.  There are four different types of business licenses issued by the Colorado Limited Gaming Control Commission:

       i.   Manufacturer/Distributor: Companies that manufacture or serve as a distributor for approved slot machines and component parts.

      ii.   Retailer: Persons permitting or conducting limited gaming on their premises.

     iii.   Operator: Persons permitting slot machines.

     iv.   Associated Equipment Supplier: Persons who import, manufacture, or distribute associated equipment in Colorado, or who otherwise act as an associated equipment supplier.

b.  A "Key License" is also required for any person who is a management employee of, or either monetarily or through decision-making influence holds a substantial interest in, a business licensee. These individuals are either referred to as a "Key" or an "Associated Person."  A "Key" is any executive, employee, or agent of a business licensee who, while physically working in a casino, has the power to exercise a significant influence over decisions affecting any part of the business.  An "Associated Person" is any stockholder holding five percent or greater interest in a gaming licensee, or any officer or director, who does not act as a Key executive, employee, or agent.

c.  Finally, a "Support License" is required for all casino employees. This includes, among other things, cashiers, change persons, slot techs, and security.

### **Individuals and Entities Involved**

30.    The following six subjects conducted, financed, managed, supervised, or owned all or part of an illegal gambling business: Nathan Sugar, Shawn Deitchman, Jovan Walker, Adam Speer, Steven Kinzly, and Sean Draper.

31.    These individuals collectively owned and/or operated eight Fish Games establishments in the state of Colorado: Crypto Arcades, Pueblo Rivers Arcade, Hot Tamale Arcade, COS Arcade, Fish Tank, Fish Tank II, MA Arcade, and Table Station (collectively referred to as the "Sugar Arcades").

32.    COS Arcade, Pueblo Rivers Arcade, and Hot Tamale Arcade, were owned and/or operated by Draper, Kinzly and Speer, as detailed below.  Fish Tank and the Fish Tank II were owned by Walker and Speer.  MA Arcade was owned solely by Speer.

|  | % owned by Draper | % owned by Kinzly | % owned by Speer |
|---|---|---|---|
| COS Arcade | 40% | 25% | 35% |
| Hot Tamale | 37% | 30% | 33% |
| Pueblo Rivers Arcade | 37% | 33% | 30% |

33.    Nathan Sugar owned and operated Crypto Arcades LLC.  Crypto Arcades LLC was an illegal gambling business, with a physical location in Pueblo, Colorado. Nathan Sugar was listed as the registered agent when Crypto Arcades filed articles of organization with the Colorado Secretary of State in February 2018, and as the "Corporate Officer."

34.    Several of the other arcades, including Pueblo Rivers Arcade, Hot Tamale Arcade, COS Arcade, Fish Tank, Fish Tank II, and MA Arcade, had a profit-sharing agreement with Nathan Sugar, and would write checks to "Crypto Arcades (Obsidian Digital Assets)" or "Obsidian Digital Assets (Crypto Arcades)."  Draper, Kinzly and Speer

received email invoices from Obsidian Innovations detailing the total amount various tables and apps took in and paid out for a set period of time.  The total due on these invoices was 50% of the profit.  Draper, Kinzley, and Speer, are the authorized signers for the business bank accounts at Security Service Federal Credit Union (SSFCU) associated with their respective arcades.  Draper is listed as the Chief Operating Officer, Speer is listed as the Chief Financial Officer, and Kinzly is listed as the President.

35.     Blackstone Digital Assets (BDA) was located at 1101 ½ S Prairie, Pueblo Colorado, right next door to Crypto Arcades' physical location. The business advertised that they buy cryptocurrency such as bitcoin and ether. The door to BDA was locked, and customers had to ring a doorbell to be let in. Inside of BDA, there was only a Currency Transaction Machine (CTM) which converted ODAC into U.S. dollars. As discussed in greater detail below, ODAC is a cryptocurrency that only existed at the Sugar Arcades, and the purpose of the CTM located at BDA was solely to convert ODAC to U.S. dollars. No other cryptocurrencies were available to buy or sell at BDA.  A review of documents from Corporate Filings show documents for BDA going to Nathan Sugar at an address in Colorado Springs.

36.     Sugar also owned related business, Obsidian Innovations, which operated in conjunction with Crypto Arcades and BDA.  Obsidian Innovations LLC was formed on September 26, 2019, in Delaware and the registered agent is Corporate Filings LLC. Nathan Sugar received the bills from the registered agent company, Corporate Filings, LLC, at an address in Colorado Springs.  Sugar also filled out and signed a certification of beneficial owner when Obsidian innovations opened a bank account at Security Service Federal Credit Union, which states that he owns 100% of Obsidian Innovations.

**Operation of Arcades**

37.    The Sugar Arcades share many features, such as the specific apps offered (Fire Kirin, River Sweeps, and Orion), but they all relied on a novel method to pay out their customers' winnings—a cryptocurrency called "ODAC."

38.    After customers were done playing, they are required to go the clerks and state that they are ready to "redeem" their credits.  Clerks corrected the customers if the term "cash out" was used and told customers they could only "redeem" their credits. The use of the term "redeem," and the refusal of employees to let customers use the term "cash out" was consistent across the Sugar Arcades.

39.    The Sugar Arcades claimed that customers do not win money, but instead win a proprietary cryptocurrency called ODAC as the prize.  ODAC is a novel type of digital currency because when customers access the ODAC ATM/CTM the screen indicates, among other things, the machine is "accessing the blockchain.[2]" Investigators believe that ODAC, or ODA Coin, is short for Obsidian Digital Asset Coin.

40.    Although some clerks will refer to the prize as cryptocurrency, others refer to it specifically as ODAC.  In one instance at Player One Arcade, the clerk described their cryptocurrency as an "in-house currency" that players could sell next door for a dollar a coin.

41.    When asked if the cryptocurrency was like bitcoin, the clerk stated that it was not market tradeable and that the arcades owned them and give them out as prizes.

42.    The Sugar Arcades customers could then sell their ODAC for $1.00 per coin less a transaction fee, which was collected by Nathan Sugar.  The CTM was usually

---

[2] A blockchain is a public ledger that allows for validation of digital currency.

located in the same Fish Games establishment so customers could immediately sell their ODAC.

43.    For example, Hot Tamale Arcade, Pueblo Rivers Arcade, and others each had an ODAC CTM on-site. A few establishments had their customers go to a second location to exchange their ODAC at a CTM.  For example, Crypto Arcades was located next to Blackstone Digital Assets, a small storefront that contained a CTM which only bought ODAC.

44.    No major exchanges, such as Coinbase or Gemini Trust Company, offer the ODAC currency, and the CTMs at the Sugar Arcades bought only ODAC from customers.  The only way to earn ODAC was to play and win the games offered at the Sugar Arcades.  ODAC did not have any market value or liquidity and could not be exchanged for anything other than U.S. currency.

45.    The use of ODAC was unique to the Sugar Arcades.

46.    Investigators conducted undercover operations at all of the Sugar Arcades. Although the same identification cards were provided in multiple locations, each location had to create separate ODAC accounts for the winnings to be paid.

47.    In addition to facilitating the exchange of U.S. dollars for Fire Kirin credits, and then Fire Kirin credits for ODAC, which were then exchanged back into U.S. dollars, Black Digital Assets also advertises on its building: "We buy cryptocurrency." There were additional signs inside Black Digital Assets advertising different cryptocurrencies such as bitcoin, bitcoin cash, and Ether.   However, in June 2021, an undercover agent (UCA) attempted to sell cryptocurrency to Black Digital Assets. Despite multiple attempts, including entering the business to redeem ODAC, the UCA was unable to contact anyone

who worked at Black Digital Assets and was unable to talk to anyone about selling cryptocurrency such as bitcoin. A search of FinCEN records did not return any registered money service businesses in Pueblo in the name of Blackstone Digital Assets, Nathan Sugar or Mr. Deitchman.

48.    Accordingly, Black Digital Assets only existed to facilitate the conversion of ODAC or credits earned/garnered from Crypto Arcades' operations into cash and did not have any other legitimate business operations.

49.    A review of the nathan@nathansugar.com emails shows correspondence between Sugar and Speer.  One notable email dated May 17, 2019, from Speer's veteran0826@gmail.com account to Sugar, includes an attached signed contract.

50.    In the email, Speer writes, "Here you go.  I'll let you know when I have the funds for you."  Both Sugar and Speer have signed and dated the contract attached to the email.  Speer appears to be the signing party for Speer Enterprises LLC and Sugar for Crypto Arcades LLC.  A review of the attached contract shows that Crypto Arcades LLC is defined as "The Company" and Speer Enterprises LLC as "the Investor."  The contract states:

> This contract certifies that The Company is receiving a sum of investment from The Investor in the amount of $5,000.00 for the development and manufacturing of new industry equipment (Hereafter, CTM). This contract is on a per Unit basis.

51.    The contract also includes a section titled "Description of Arcade Operations" and the details as follows: "The way The Arcades work is simple, customers purchase credits to play the games to win Tickets. Once they win the tickets and wish to redeem they exchange those tickets for a prize.  Prizes vary based on location but the

main prize for each location is Crypto Currency… (My company has developed an in house stable coin (ODA Coin) to operate these arcades to avoid any fluctuation in pricing as is seen in BTC(Bitcoin) and other mainstream currencies.)… Once they receive their Crypto in order to receive cash they must sell their coins. In previous models I had a separate business next door or nearby that purchased their crypto, however this is a very expensive method and requires additional employees, buildings, utilities etc… Over the last year I have been developing a new system that enables the location to have a single Crypto ATM(CTM) in its location or nearby that customers can sell their coins to without having all of the added expenses. In addition for each transaction that occurs my CTM(Crypto Trade Machine) charges a 10% transaction fee to the customer. This system not only saves tens of thousands a year in efficiencies but it generates an entirely new revenue stream at the same time…I have partnered with the game manufacturer and distributor to incorporate my system into all existing and future locations across this country and others."

### Undercover Operations

52.    During an undercover operation in June 2021, an undercover agent downloaded the Fire Kirin app and there were over a dozen games, including the "fish games." Some of the games were also slots emulators which look and play like traditional slot machines, which are clearly not games of skill.

53.    On July 1, 2021, Pueblo Police Department (PPD) officers conducted a ruse at the Crypto Arcades/Black Digital Assets location in order to gain information about the business. During the operation, the following occurred:

  a.    A PPD undercover officer (the "PPD UC") falsely claimed to have won credits in the Fire Kirin app when they had not. The clerk at

Crypto Arcades reviewed the records related to the PPD UC's activity on the app purchased the day prior, which the clerk claimed to have in exacting detail, and declared that the PPD UC had not won and needed to leave.

b. As part of the ruse, the PPD UC then called PPD dispatch and claimed that they had been scammed. Uniformed PPD officers arrived on the scene. The doors for Crypto Arcades were locked and PPD officers spoke to the clerk through the closed door. The clerk stated that the manager had been notified and would be there shortly. The clerk also claimed to have records to refute the claim by the PPD UC.

c. A while later, Nathan Sugar arrived at Crypto Arcades. Mr. Sugar would not provide his name nor his contact information to the law enforcement officers.

d. During the contact, Nathan Sugar explained that Crypto Arcades did not redeem cash, but instead only offered prizes like teddy bears and PlayStations. This is false, because PPD and IRS-CI have conducted numerous interactions with Crypto Arcades. During these interactions, undercover officers and agents have set up Fire Kirin accounts, played the games offered on the app and redeemed credits from their accounts. In all those interactions, Crypto Arcades clerks have never offered or mentioned a prize, other than redeeming winnings through the use of ODAC at Black Digital Assets next door.

e. During the interaction with PPD, Nathan Sugar had the ability to refute the PPD UC's claim with the report that the clerk spoke about. He instead would not provide any evidence to refute the PPD UC's claim.

## **Financial Analysis**

54.    All the establishments in the Sugar Arcades sent regular payments either to Sugar directly, or to two businesses over which he has sole ownership: Crypto Arcades and Obsidian Innovations.

55.    Between December 1, 2020, and July 31, 2021, accounts in the names of Hot Tamale Arcade, Pueblo Rivers Arcade, COS Arcade, Fish Tank, Fish Tank II, and MA Arcade sent a total of at least $1.9 million to SSFCU accounts in the name of Crypto Arcades or Obsidian Innovations.

56.     Between October 1, 2019, and May 2021, SSFCU accounts in the name of Crypto Arcades or Obsidian Innovations sent at least $1.4 million to SSFCU accounts in the name of Nathan Sugar.

57.     Crypto Arcades has had three different accounts at SSFCU: 6596835000, 6572818000, and 6575062000. Each account can have multiple sub accounts.   For example, 6596835000 has 6596835071 and 6596835072 as subaccounts. All the accounts have the same name, *i.e.*, Crypto Arcades, and unless otherwise noted by SSFCU, the signature card for the account applies to the subaccounts as well.  Sugar is listed as an authorized signor on the signature cards for all three accounts and Deitchman is an authorized signor on the account ending in 5000, and the 6575062072 sub account.

58.     Sugar was listed as the registered agent when Crypto Arcades filed articles of organization with the Colorado Secretary of State in February 2018. Sugar is listed as the "Corporate Officer."

59.     SSFCU also provided multiple documents for an account belonging to Obsidian Innovations.  Per these documents, Sugar was the authorized signor on account 6572826000.

60.     SSFCU also provided a copy of an IRS form for Obsidian Innovations showing that Sugar completed a "Certification Regarding Beneficial Owners of Legal Entity Customers" for Obsidian Innovations.  The certification lists Sugar as the sole owner and president. The form was signed by Sugar on October 7, 2019.

61.     Financial analysis shows that Deitchman is the manager of Crypto Arcades. Copies of bank statements, checks and deposit slips from Crypto Arcades account ending in 5000 at SSFCU show numerous checks written by Deitchman. The checks are written

on a weekly and/or biweekly basis to employees at the Crypto Arcades location.

62.    All of the Six Arcades have written checks addressed to businesses associated with Sugar.  Checks were written to Crypto Arcades, Obsidian Innovations, Obsidian Digital Assets, and variations or combinations of the three.

63.    The chart below details the total amount of checks written to Crypto Arcades/Obsidian Innovations/Obsidian Digital Assets from each of the six arcades between October 2020 and July 2021:

| Arcade Name | Sum of Checks |
|---|---|
| COS Arcade | $670,480.66 |
| Fish Tank | $112,104.94 |
| Fish Tank II | $32,895.08 |
| Hot Tamale Arcade | $339,233.27 |
| MA Arcade | $59,219.90 |
| Pueblo Rivers Arcade | $744,926.55 |
| **TOTAL** | **$1,958,861.60** |

64.    At least $1.1 million of these checks were deposited in the Crypto Arcades and Obsidian Innovations accounts at SSFCU.

65.    In addition, at least $4.09 million in cash was deposited into accounts associated with Nathan Sugar, including personal accounts and accounts held in the names of his businesses and over which he had signatory authority, from October 1, 2019, to May 31, 2021.

## Defendant Assets

66.    On February 24, 2022, federal search warrants were executed at the Sugar Arcades, as well as the residences of Shawn Deitchman, Nathan Sugar, Jovan Walker, Sean Draper, and Adam Speer.

67.     The following defendant assets were seized on February 24, 2022, from the Sugar Arcades:

| Sugar Arcade | Defendant U.S.C. |
|---|---|
| Fish Tank II | $5,264 in United States currency |
| Player One Arcades | $7,930.63 in United States currency |
| COS Arcade | $22,189.00 in United States currency |
| MA Arcade | $4,658.00 in United States currency |
| Hot Tamale Arcade | $9,760.00 in United States currency |
| Pueblo Rivers Gaming | $15,073.75 in United States currency |
| Table Station | $2,030.00 in United States currency |
| Crypto Arcades/Blackstone Digital Assets | $14,580.00 in United States currency |

Sugar Assets

68.     On February 24, 2022, a federal search warrant was also executed at the home of Nathan Sugar, 1593 Top Notch Trail, Penrose, Colorado.   Agents seized defendant $5,874.78 United States currency and defendant Miscellaneous Precious Metal Coins and Bars.

69.     Agents also seized $4,440.00 in United States currency from 68 Tumbleweed Drive, Penrose, Colorado, a large garage down the street from 1593 Top Notch Trail that was purchased by Nathan Sugar.

70.     Additionally, during the execution of the search warrant at 1593 Top Notch Trail, a hardware wallet, (physical device used to store cryptocurrencies offline) was found inside a safe.  The seed phase (sequence of random words that stores the data required to access cryptocurrency) was also in the safe, allowing agents to recreate the private

keys (password) stored on the hardware wallet and transfer the defendant cryptocurrency to the United States pursuant to the search warrant.

71.     The following defendant Miscellaneous Cryptocurrencies were seized from Nathan Sugar:

        a.  5.0089173 BITCOIN (BTC)
        b.  9.99999003 Bitcoin Cash (BCH),
        c.  1203.41727119 Dash (DASH),
        d.  550.6499262 Litecoin (LTC),
        e.  78.43064211 Zcash (ZEC),
        f.  8.987169 Ethereum (ETH)
        g.  99.998656 Ethereum Classic (ETC), and
        h.  103807 Cardano (ADA).

72.     On February 24, 2022, a federal search warrant was executed at the home of Adam Speer, 26998 Big Springs Road, Calhan, Colorado.  Agents seized defendant $6,687.00 in United States currency.

73.     On February 24, 2022, a federal search warrant was executed at the home of Javon Walker, 5121 W. 11th St., Unit 404 Greeley, Colorado.  Agents seized defendant $1,219.00 in United States currency.

## Related Criminal Charges

74.     On July 26, 2023, Nathan Sugar, Jovan Walker and another individual were charged in the District of Colorado by federal Superseding Indictment.  Sugar and Walker were charged with conducting, financing, managing, supervising, directing, or owning all and part of an illegal gambling business in violation of the laws of the State of Colorado, to wit, C.R.S. §§ 18-10.5-103 and 18-10-103, in violation of 18 U.S.C. § 1955, and conspiracy to do the same in violation of 18 U.S.C. § 371.  Additionally, Sugar was charged with violations of 18 U.S.C. § 1956 and 1957.

75.     A forfeiture allegation was included in the Superseding Indictment, noticing

the defendant of the United States' intent to forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses in Counts One and Two, charging violations of 18 U.S.C. § 1955 and 18 U.S.C. § 371, and in any property involved in the offenses in Counts Three, Four, and Five, charging violations of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i) and 2, 1957(a) and 2, respectively.

76.    Nathan Sugar has never been located to be arraigned.

77.    On June 25, 2024, Jovan Walker entered into a pretrial diversion agreement with the Government which resolved the case by way of deferred prosecution in exchange for community service and certain other conditions.

78.    In conclusion, the defendant assets constitute property involved in violations of 18 U.S.C. §§ 1956 and 1957, and constitute or were derived from proceeds traceable to violations of 18 U.S.C. § 1955, and are therefore forfeitable to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

DATED this 12th day of December 2025.

Respectfully submitted,

PETER MCNEILLY
United States Attorney

By: *s/Zachary Phillips*
Zachary Phillips
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Ste. 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: Zachary.phillips@usdoj.gov

VERIFICATION OF NAME
SPECIAL AGENT, INTERNAL REVENUE SERVICE

I, Internal Revenue Service-Criminal Investigations Special Agent, hereby state and aver under the pains and penalties of perjury that I have read the foregoing Factual Basis for Forfeiture and that the facts and information contained therein are true.

s/ _____

Lisa Palmer
Special Agent – IRS-CI

**FIRST CLAIM FOR RELIEF**

79.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

80.    By the foregoing and other acts, defendant $5,264.00 USC seized from 2723 W. 11th St. Greeley, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**SECOND CLAIM FOR RELIEF**

81.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

82.    By the foregoing and other acts, defendant $5,264.00 USC seized from 2723 W. 11th St. Greeley, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**THIRD CLAIM FOR RELIEF**

83.    The Plaintiff repeats and incorporates by reference each of the paragraphs

above.

84.    By the foregoing and other acts, defendant $7,930.63 USC seized from 2864 Colorado Blvd., Denver, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF

85.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

86.    By the foregoing and other acts, defendant $7,930.63 USC seized from 2864 Colorado Blvd., Denver, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## FIFTH CLAIM FOR RELIEF

87.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

88.    By the foregoing and other acts, defendant $22,189.00 seized from 3273 S. Academy Blvd, Colorado Springs, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## SIXTH CLAIM FOR RELIEF

89.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

90.    By the foregoing and other acts, defendant $22,189.00 seized from 3273 S.

Academy Blvd, Colorado Springs, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SEVENTH CLAIM FOR RELIEF

91.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

92.    By the foregoing and other acts, defendant $4,658.00 USC seized from 3958 N. Academy Blvd., Unit 112, Colorado Springs, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## EIGHTH CLAIM FOR RELIEF

93.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

94.    By the foregoing and other acts, defendant $4,658.00 USC seized from 3958 N. Academy Blvd., Unit 112, Colorado Springs, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## NINTH CLAIM FOR RELIEF

95.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

96.    By the foregoing and other acts, defendant $9,760.00 USC seized from 2402 E. Boulder, Colorado Springs, CO constitutes property involved in violation of 18

U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## TENTH CLAIM FOR RELIEF

97.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

98.    By the foregoing and other acts, defendant $9,760.00 USC seized from 2402 E. Boulder, Colorado Springs, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## ELEVENTH CLAIM FOR RELIEF

99.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

100.    By the foregoing and other acts, defendant $15,073.75 USC seized from 1722 S. Prairie Ave., Pueblo, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## TWELFTH CLAIM FOR RELIEF

101.    The Plaintiff repeats and incorporates by reference each of the paragraphs above.

102.    By the foregoing and other acts, defendant $15,073.75 USC seized from 1722 S. Prairie Ave., Pueblo, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## THIRTEENTH CLAIM FOR RELIEF

103.   The Plaintiff repeats and incorporates by reference each of the paragraphs above.

104.   By the foregoing and other acts, defendant $2,030.00 USC seized from 1740 S. Buckley Road, Unit 9, Aurora, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTEENTH CLAIM FOR RELIEF

105.   The Plaintiff repeats and incorporates by reference each of the paragraphs above.

106.   By the foregoing and other acts, defendant $2,030.00 USC seized from 1740 S. Buckley Road, Unit 9, Aurora, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## FIFTEENTH CLAIM FOR RELIEF

107.   The Plaintiff repeats and incorporates by reference each of the paragraphs above.

108.   By the foregoing and other acts, defendant $14,580.00 USC seized from 1101/1101.5 S. Prairie Ave., Pueblo, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## SIXTEENTH CLAIM FOR RELIEF

109.   The Plaintiff repeats and incorporates by reference each of the paragraphs

above.

110.  By the foregoing and other acts, defendant $14,580.00 USC seized from 1101/1101.5 S. Prairie Ave., Pueblo, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### SEVENTEENTH CLAIM FOR RELIEF

111.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

112.  By the foregoing and other acts, defendant $5,874.78 USC seized from 1593 Top Notch Trail, Penrose, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### EIGHTEENTH CLAIM FOR RELIEF

113.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

114.  By the foregoing and other acts, defendant $5,874.78 USC seized from 1593 Top Notch Trail, Penrose, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### NINETEENTH CLAIM FOR RELIEF

115.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

116.  By the foregoing and other acts, defendant $4,440.00 USC seized from 68

Tumbleweed Dr, Penrose, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## TWENTIETH CLAIM FOR RELIEF

117.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

118.  By the foregoing and other acts, defendant $4,440.00 USC seized from 68 Tumbleweed Dr, Penrose, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## TWENTY-FIRST CLAIM FOR RELIEF

119.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

120.  By the foregoing and other acts, defendant Miscellaneous Precious Metal Coins and Bars constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## TWENTY-SECOND CLAIM FOR RELIEF

121.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

122.  By the foregoing and other acts, defendant Miscellaneous Cryptocurrencies seized from Nathan Sugar constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United

States pursuant to 18 U.S.C. § 981(a)(1)(A).

## TWENTY-THIRD CLAIM FOR RELIEF

123.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

124.  By the foregoing and other acts, defendant Miscellaneous Cryptocurrencies seized from Nathan Sugar constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## TWENTY-FOURTH CLAIM FOR RELIEF

125.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

126.  By the foregoing and other acts, defendant $6,687.00 USC seized from 26998 Big Springs Rd. Calhan, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## TWENTY-FIFTH CLAIM FOR RELIEF

127.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

128.  By the foregoing and other acts, defendant $6,687.00 USC seized from 26998 Big Springs Rd. Calhan, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## TWENTY-SIXTH CLAIM FOR RELIEF

129.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

130.  By the foregoing and other acts, defendant $1,219.00 USC seized from 5121 W. 11th St., Unit 404 Greeley, CO constitutes property involved in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## TWENTY-SEVENTH CLAIM FOR RELIEF

131.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

132.  By the foregoing and other acts, defendant $1,219.00 USC seized from 5121 W. 11th St., Unit 404 Greeley, CO constitutes or was derived from proceeds traceable to violations of illegal gambling business in violation of 18 U.S.C. § 1955, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States prays for entry of a final order of forfeiture for the defendant assets in favor of the United States, that the Unites States be authorized to dispose of the defendant assets in accordance with law, and that the Court enter a finding of probable cause for the seizure of the defendant assets and issue a Certificate of Reasonable Cause pursuant to 28 U.S.C. § 2465.

DATED this 12th day of December 2025.

Respectfully submitted,

PETER MCNEILLY
United States Attorney

By:  s/*Zachary Phillips*
Zachary Phillips
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0402
E-mail: Zachary.Phillips@usdoj.gov
*Attorney for Plaintiff*